IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-HC-2124-BO

| | |
|---|---|
| ELIZABETH K. KING, )<br>　　　　Petitioner, )<br>　　　　　　　　　　　　 )<br>　v. 　　　　　　　　　　 )<br>　　　　　　　　　　　　 )<br>STATE OF NORTH CAROLINA, )<br>　　　　Respondent. ) | O R D E R |

Elizabeth King, a state prisoner, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a motion for summary judgment. [D.E. 6 -7] Petitioner was notified of the filing [D.E. 8] and thereafter responded [D.E. 10]. The matter is now properly before the court for disposition.

On October 16, 2008, in the Superior Court of Camden County petitioner was convicted after a jury trial of first-degree murder. Pet. at 1. She was sentenced to life without parole. Id. At trial, Andrew Womble and Nicole Hancock represented petitioner. Id. at 12. On February 16, 2010, the North Carolina Court of Appeals issued an opinion finding no prejudicial error. State v. King, 202 N.C. App. 585, 691 S.E.2d 132 (2010). On appeal, William D. Spence represented petitioner. Id.

On March 19, 2010, petitioner filed a pro se certiorari petition in the Supreme Court of North Carolina, that was denied on June 16, 2010. State v. King, 364 N.C. 245, 699 S.E.2d 638 (2010). No other post-conviction filings have been made in state court. Pet. at 8. Petitioner dated this federal habeas corpus petition June 29, 2011, and on July 1, 2011, the petition was filed in this court.

## GROUNDS FOR RELIEF

Petitioner contends: (1) the trial court erred in denying her motion to dismiss the first-degree murder charge on grounds of insufficient evidence; and (2) the trial court erred in allowing the forensic pathologist, Dr. M.G.F. Gilliland, to testify about an autopsy she did not perform.

## BACKGROUND

The Court of Appeals found the following:

A. Testimony of Events Surrounding the Murder
On 11 April 2006, Scott Daniel came home to see his mother, defendant, crying in the living room of their house. Defendant acted very distraught, and told Scott that Bobby [Bobby Mansfield the murder victim and boyfriend of defendant] had threatened to kill Scott and his half brother, Cameron. After defendant revealed this information, the following alternate sequence of events were offered at trial.

Scott's Testimony for the State
Defendant explained to Scott that Bobby was known as a violent person, and defendant said that Bobby "needs to get out of our lives[.]" Defendant and Bobby had been dating for about two years before Scott moved into defendant's home, and Scott was aware that Bobby and defendant used drugs together. At one point in the conversation, defendant asked Scott, "Do you think we'd go to hell if we took him out?" The discourse then escalated, and defendant suggested that Scott could hide in the trunk of her car, a Mercury Grand Marquis, so that he could jump out and attack Bobby.

After devising this plan, defendant and Scott prepared to leave the house. Defendant told Scott to get a bat, and she went to grab a knife. Scott grabbed some gloves, and a blanket was already in the car. Scott got into the Mercury, and started driving to Bobby's house. On the way, defendant called Bobby, and asked him over the speaker on her cellphone whether he wanted to get high with her. Scott drove past Bobby's house so that he could climb into the trunk of the car next to a trail. Once Scott was inside, defendant turned around, and went to Bobby's house.

Bobby and defendant began talking once Bobby got into the car. They both started getting high, and in the early morning hours of 12 April 2006, defendant parked the Mercury in a field on Hales Lake Road, Camden County, North Carolina. Defendant popped open the trunk of the car, and laid out a blanket for her and Bobby to lay on. After about ten or fifteen seconds, Scott jumped out with the baseball bat in his hand, and got in Bobby's face.

2

As Scott was confronting Bobby, defendant came from behind, and stabbed Bobby in the back with a knife. Defendant left the knife in Bobby, and told Scott to "[f]inish him off." Scott hit Bobby in the head with the bat, and Bobby stumbled over to the driver's side of the car. Bobby reached down and threw sand in Scott's eyes, and Scott became afraid that Bobby might escape. Scott then approached Bobby, and struck him in the head ten or fifteen times with the baseball bat. As Bobby was lying face down in the dirt, defendant came over and said, "Make sure he's dead." Scott kneeled down, took the knife out of Bobby's back, and proceeded to stab him several times while looking for movement. Bobby remained motionless during the stabbing.

Scott started covering up the evidence afterward, during which defendant became hysterical and started screaming. At some point, defendant composed herself, and wrapped the knife and the bat in the blanket. Since Scott and defendant were both nervous, they drove away without covering up their tire tracks. Defendant told Scott to drive to Bertie Bridge, where defendant threw the blanket and murder weapons into the river. Scott and defendant cleaned the car the next morning.

Police first interviewed Scott on 7 July 2006, and Scott told the officers what defendant had told him to say: he didn't know anything about Bobby's murder, and he had been to a friend's house on 11 April 2006. On 30 August 2006, police arrested Scott in connection with the murder, and interviewed him again. During the second interview, Scott did not implicate defendant, and told police that he drove to Bobby's house only with the intent to scare him. On 22 October 2006, Scott gave a third statement to police, where he recounted the events detailed above incriminating defendant.

Defendant's Testimony
Defendant first met Bobby in a night club in Edenton, North Carolina, in 1975, and the two dated for several years before becoming engaged. The engagement was eventually broken off. However, when defendant moved back to Edenton in 2004, she contacted Bobby, and the two resumed their relationship.

On or about 8 April 2006, defendant went to visit Bobby in the afternoon. At that time, Bobby was living with his mother in Camden County, and Bobby invited defendant to come over while his mother was out of town spending time at the beach. Defendant decided to meet with Bobby, because she wished to end the relationship.

When defendant arrived at the house, Bobby was not in a good mood, and he became verbally aggressive. Bobby regularly abused defendant verbally and physically, and she testified that Bobby "proceeded to say things that [she] had never heard him say before." Defendant claimed that Bobby made her go to a convenience store in order to cash her monthly child support check, because Bobby wanted to buy beer and drugs with the money. Upon arriving at the store, defendant

3

made a scene, saying that she did not want to cash the check. The check was not cashed, and Bobby threw beer bottles at defendant once they reached the parking lot.

Bobby and defendant returned to Bobby's mother's house after going to the store. When they got inside, Bobby decided to eat a bowl of cereal. Defendant bumped into him as he was walking around with the bowl, and Bobby grabbed defendant and poured the cereal and milk over her head as he cursed at her. At some point during Bobby's assault, he said that "he was going to take the life of [defendant's] youngest child [Cameron]." Defendant was surprised by Bobby's threat, even though Bobby had talked about being aggressive toward other people prior to this statement. After Bobby made the threat, he grabbed defendant's hair, and threw her from one side of the room to the other several times. Defendant got loose, and tried to grab her belongings from the kitchen. Bobby threw her down again before she could leave, and he kicked her repeatedly as she laid on the floor curled in a ball. Defendant suffered a cracked tooth and whiplash from the incident.

Defendant eventually escaped to her car, and drove away from Bobby's house. Defendant stopped her car in an abandoned lot, and several police cars came up to her. The police escorted her to the station, and defendant took out a domestic violence order against Bobby. Defendant called Scott to come to Elizabeth City, North Carolina, to bring her home. Scott drove over, and escorted defendant back to Edenton.

The next day, 9 April 2006, Bobby called defendant, and invited her over for a cookout. Bobby suggested that defendant could bring Cameron over, and defendant interpreted Bobby's invitation to be another threat toward Cameron's life.

On Monday, 10 April 2006, defendant visited Dr. Linda Abbott to have her neck examined. Defendant was in a lot of pain from her fight with Bobby the previous Saturday, and Dr. Abbott suggested that defendant see a chiropractor, Robbie Miller. Upon returning home, defendant talked to Scott about her relationship with Bobby, and told Scott that she had called Bobby earlier in the day. Bobby informed defendant over the phone that the domestic violence papers had not been served on him.

On 11 April 2006, Scott came to defendant after everyone else in the house had gone to bed. Defendant told Scott that she was scared, and defendant felt that the Camden Police Department was not following through with her domestic violence complaint. Defendant and Scott discussed going over to Bobby's to talk to him, but did not create a plan to harm him. Defendant hoped only to "put some fear in" Bobby so that he would leave her alone. Scott said that he wanted the relationship with Bobby to end.

4

Defendant and Scott discussed whether Scott should get a bat, but defendant did not order him to get one. While defendant remained sitting at the kitchen table, Scott talked, grabbed a baseball bat, and took out a kitchen knife. Scott handed defendant the knife, and she took it to the car. Defendant placed the knife in the console area of the car, and Scott and defendant left the house to go confront Bobby.

As the car approached Bobby's house, defendant told Scott to get out of the car, because she was afraid that Bobby might become violent toward them if he saw Scott accompanying her. Defendant told Scott to get in the trunk, and she went and picked up Bobby. Defendant started driving, and Bobby told her where to go. Defendant did not tell Bobby she was coming over to do drugs with him.

As they drove, Bobby pulled out some drugs, and defendant pulled over the side of the road to take a drag off Bobby's pipe. Defendant drove a little further, and pulled into a field. Bobby and defendant got out of the car, and defendant popped open the trunk, because she was concerned about Scott being able to breathe. Defendant pulled a blanket out of the trunk, spread it on the ground, and told Bobby that she wanted to discuss some things. After defendant laid out the blanket, she turned to see Scott and Bobby facing one another.

Defendant noticed that Scott looked scared, and saw Bobby beginning to lunge at Scott. Scott said, "Help, mama," so defendant reached in the car window, took out the knife that she had moved to the passenger seat, and stabbed Bobby in the back. Bobby turned around to look at her, which scared defendant. Defendant ran away, and when she turned around, she saw Scott hitting Bobby with the bat as he lay on the ground with the knife in his back.

After Scott finished hitting Bobby with the bat, Scott and defendant got in the car. Scott brought the bat with him to the front seat, and defendant told Scott that the knife was still in Bobby's back. Scott got out of the car, grabbed the knife, and stabbed Bobby a few more times.

When police came to interview defendant and Scott in connection with Bobby's murder, defendant told Scott to lie to the police.

B. Further State's Evidence
Bobby's body was found and reported to police on the morning of 12 April 2006. Special Agent Christopher Conway arrived at the crime scene, and took shoe and tire impression castings from the ground. Special Agent Conway noted a rounded indentation in the ground consistent with the end of a baseball bat. An examination of Bobby's body by Special Agent Conway showed that he was stabbed five times in his back and left shoulder, and that his skull was broken into small fragments with "several small pieces of tissue and matter" located around his head.

5

Dr. Pessinder and Dr. Lockmuller performed Bobby's autopsy. The autopsy was reviewed by Dr. M.F.G. Gilliland, an expert pathologist, who testified at trial that Bobby died as a result of "multiple blunt and sharp force injuries" to the head. Dr. Pessinder was not present at trial; however, Dr. Gilliland testified that Dr. Lockmuller was in the courtroom during his testimony.

On 30 June 2006, Deputy Jay Winslow, a narcotics investigator with a drug task force working both Camden County and Pasquotank County, interviewed another one of defendant's sons, Eric Daniel. Deputy Winslow conducted the interview at defendant's home, and as he was leaving, noticed that defendant's Mercury Grand Marquis had Mastercraft Sensys 01 tires.

On 6 September 2006, Deputy Winslow executed a search warrant to take impressions of the tires on defendant's vehicle. The impressions taken at Hales Lake Road and from defendant's Grand Marquis were examined by Special Agent Karen Morrow, an agent in the latent evidence section of the State Bureau of Investigation. Special Agent Morrow prepared a report with her findings, and testified that the physical size and design of the impressions taken from defendant's car corresponded to the single tire impression taken at the crime scene.

C. Procedural History

On 23 October 2006, a grand jury indicted defendant on the charge of murder. Trial began on 13 October 2008; and on 16 October 2008, the jury found defendant guilty of first-degree murder on two theories: (1) lying in wait and (2) premeditation and deliberation. Defendant properly gave oral notice of appeal after being sentenced to life without parole. Defendant now appeals her conviction to this Court, and raises four issues: (1) whether the trial court erred in denying defendant's motion to dismiss at the close of all the evidence; (2) whether the trial court properly allowed one of the State's photographs into evidence; (3) whether it was plain error to allow an expert pathologist to testify as to Bobby's cause of death, where the testifying pathologist did not conduct Bobby's autopsy; and (4) whether the trial court erred in instructing the jury on the theory of "lying in wait."

King, 202 N.C. App. 585, *1-*4.

## DISCUSSION

A.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see Hardy v. Cross, ___ U.S. ___, 132 S. Ct. 490, 493–94 (2011) (per curiam); Bobby v. Dixon, , ___ U.S. ___, 132 S. Ct. 26, 29–31 (2011) (per curiam); Cavazos v. Smith, , ___ U.S. ___, 132 S. Ct. 2, 4–8 (2011) (per curiam); Renico v. Lett, , ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc); see also, Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 784-85 (2011) (a state court need not cite or even be aware of the Supreme Court precedent, '[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the

7

state court to deny relief.") Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

    B.    Claims

        i.    Insufficiency of Evidence

Petitioner's first claim is for insufficiency of evidence to establish the elements of first degree murder on the theory of lying in wait and premeditation and that petitioner was the perpetrator. A state prisoner may challenge the sufficiency of the evidence in a federal habeas corpus proceeding pursuant to 28 U.S.C. § 2254(d). Torres v. Mullin, 317 F.3d 1145, 1151 (10th Cir.2003). In determining whether there was sufficient evidence to support a petitioner's conviction, the Supreme Court held in Jackson v. Virginia that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts." Id. Furthermore, the Supreme Court has held that any claim of insufficient evidence is necessarily a federal due process claim. See Jackson, 443 U.S. at 321; In re Winship, 397 U.S. 358, 364 (1970). See also West v. Wright, 931 F.2d 262, 266 (4th Cir. 1991) (any challenge to sufficiency of evidence is necessarily due process challenge), overruled on other grounds, 505 U.S. 277 (1979).

The Court of Appeals in a detailed order held the following as to this claim.

3. Substantial Evidence
The State's evidence in the case sub judice included the testimony of Scott Daniel, who testified that defendant: (1) suggested that they should kill Bobby; (2) created a

8

Case 5:11-hc-02124-BO   Document 12   Filed 09/10/12   Page 8 of 18

plan to kill Bobby, which included Scott hiding in the trunk of the car; (3) ordered Scott to retrieve weapons; (4) brought the weapons to the car; (5) called Bobby prior to their arrival to see if he wanted to do drugs in order to get him into the car; (6) assisted in hiding Scott in the trunk of the car with a baseball bat in hand; (7) took Bobby to the middle of a field; (8) opened the trunk of the car for Scott to come out and surprise Bobby; (9) stabbed Bobby in the back with a knife; (10) helped dispose of the murder weapons, and cleaned up the car; and (11) told Scott to lie about his role in Bobby's death when police interviewed him.

The State also presented evidence that: (1) the tires on defendant's car were consistent with tire tracks left at the crime scene; and (2) Bobby was not in good health at the time the murder occurred, and the pain in his legs inhibited his mobility.

Under the doctrine of "acting in concert," the jury reasonably concluded that defendant murdered Bobby under the theory of lying in wait, because the State presented substantial evidence that Scott and defendant were acting "together in pursuance of a common plan or purpose[.]" North Carolina v. Wilkerson, 363 N.C. 382, 424, 683 S.E.2d 174, 200 (2009). Though defendant offered evidence that she did not intend to harm Bobby and that she only stabbed Bobby to protect Scott, we must view the evidence "in the light most favorable to the State[.]" North Carolina v. Powell, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). Since Scott's testimony and the corroborating forensic evidence offered at trial support the conclusion that defendant and Scott perpetrated the murder through "ambush and surprise," defendant's motion to dismiss the charge of murder at the close of all the evidence was properly denied as to the theory of lying in wait.

With respect to the theory of premeditation and deliberation, Scott testified:

A. Then I guess-well after that basically that's whenever every-the planning came in. She basically, you know, said, you know, she told me to go get a bat. She went to get a knife. And I guess I went to get some gloves and all that.

. . . .

Q. And you referred a moment ago in your testimony to planning. What was the plan, if there was one?

A. I mean, it wasn't really thought out. I mean, she basically just said on the spur of the moment like maybe, you know, you could be in the trunk and then I could, you know, kick him in a designated spot. She basically made it sound like she could pop the trunk and I could get out and, you know-

. . . .

Q. Let me ask it this way, Mr. Daniel, what, if anything, did your mother say after stabbing Mr. Mansfield?

9

A. "Finish him off."

Q. Is that your best recollection of what she said?

A. Yes, sir.

Q. Now after you struck him several times with the bat, from your testimony, you have just told us, I think, at that point your mother came over to the car?

A. Yes, sir.

Q. And what did she say then?

A. Basically to make sure he was dead and she was-so I went over there and took a knife and stabbed him a couple of times to make sure he was, and of course he was.

At trial, defendant's own testimony showed that she arrived at Bobby's house with weapons and her son hidden in the trunk. She admitted that she opened the trunk for Scott in the field, and acknowledged that she stabbed Bobby in the back after letting Scott out. Scott's testimony in conjunction with these undisputed facts are sufficient for a reasonable mind to conclude that defendant had the specific intent to effectuate a "fixed design to kill [.]" North Carolina v. Hunt, 330 N.C. 425, 427, 410 S.E.2d 478, 480 (1991); North Carolina v. Fields, 315 N.C. 191, 200, 337 S.E.2d 518, 524 (1985) (specific intent).

Defendant nevertheless contends that this case is similar to State v. Corn, 303 N.C. 293, 278 S.E.2d 221 (1981), where our Supreme Court reversed a murder conviction based on premeditation and deliberation. The Corn Court noted in its decision:

> There is no evidence that defendant acted in accordance with a fixed design or that he had sufficient time to weigh the consequences of his actions. Defendant did not threaten Melton before the incident or exhibit any conduct which would indicate that he formed any intention to kill him prior to the incident in question. There was no significant history of arguments or ill will between the parties. Although defendant shot deceased several times, there is no evidence that any shots were fired after he fell or that defendant dealt any blows to the body once the shooting ended.
>
> All the evidence tends to show that defendant shot Melton after a quarrel, in a state of passion, without aforethought or calm consideration. Since the evidence is insufficient to show premeditation and deliberation, we find that the trial court erred in instructing the jury that they could find defendant guilty of first degree murder and defendant is awarded a new

10

> trial for a determination of whether or not defendant is guilty of second
> degree murder, voluntary manslaughter or not guilty.

Corn, 303 N.C. at 298, 278 S.E.2d at 224.

> Here, Scott testified that defendant's intent to kill Bobby first arose in their home
> prior to leaving. Defendant and Bobby had a history of "ill will," and Scott testified
> that defendant told him several times during the killing to "finish" Bobby off. Unlike
> Corn, this evidence clearly shows that: (1) defendant had ample opportunity to change
> her course of action before stabbing Bobby in the back in an isolated field in the
> middle of the night, and (2) defendant was not overcome by a "state of passion."
>
> Though defendant testified that she was only reacting to Bobby's "lunge" toward
> Scott in the early morning hours of 12 April 2006, the evidence in a light most
> favorable to the State nonetheless supports the charge of murder by premeditation and
> deliberation. Thus, denying defendant's motion to dismiss as to this theory was also
> properly denied. This assignment of error is overruled.

King, 202 N.C. App. at *6-*8.

The Court of Appeals' opinion as to the sufficiency of evidence in convicting petitioner of first degree murder on the theory of premeditation and lying in wait did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, i.e., Wright v. West and Jackson v. Virginia. Nor is the opinion based on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings. See Harrington, U.S. at ___, 131 S. Ct. at 784-85; see also Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1389-99 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). The claim is dismissed.

  ii.  Sixth Amendment

The second issue asserted by petitioner is that the trial court erred in allowing the forensic pathologist, Dr. M.G.F. Gilliland, to testify about an autopsy she did not perform in violation of the confrontation clause of the Sixth Amendment. Because trial counsel did not object to the

11

witness at trial, respondent argues the issue is procedurally barred. See Daniels v. Lee, 316 F.3d 477, 487-88 (4th Cir. 2003) (availability of plain error review in state appellate court of claim which was procedurally defaulted because not raised at trial does not eliminate prior procedural default), cert. denied, 540 U.S. 851 (2003); see also, Hyde v. Branker, 286 Fed. App'x. 822, 830 (4th Cir. 2008) (unpublished) (finding plain error review constitutes procedural bar but since state court applied due process standard the Fourth Circuit went ahead and addressed the merits and did not reach the issue of whether procedural bar was independent of federal law). The Court of Appeals however made detailed findings in resolving this issue based on plain error. This court finds that resolution of the issue on the merits, without addressing the procedural bar issue, is likewise prudent in this case. See, e.g., Hyde, 286 Fed App'x at 830.

> The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In Crawford, after reviewing the Clause's historical underpinnings, [the Supreme Court] held that it guarantees a defendant's right to confront those "who 'bear testimony' " against him. 541 U.S., at 51, 124 S.Ct. 1354. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id., at 54, 124 S.Ct. 1354.

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309, 129 S. Ct. 2531 (2009). This includes a class of testimonial statements. Id. The Supreme Court went on to explain that:

> "Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id., at 51–52, 124 S.Ct. 1354 (internal quotation marks and citations omitted).

Id. Thus, the court will begin with the premise that Dr. Gilliland's expert testimony concerning the cause of death, based on an autopsy report prepared by another medical doctor, violated petitioner's right to confrontation as guaranteed by the Sixth Amendment. Therefore, the court must determine if the error was harmless. See Brecht v. Abrahamson, 507 U.S. 619, 637, 133 S. Ct. 1710 (1993) (harmless error standard on federal habeas review requires trial error to have "substantial and injurious effect or influence in determining the jury's verdict" to warrant relief).

The Court of Appeals addressed the issue in a detailed discussion as follows.

C. Expert Testimony
Defendant contends that Dr. Gilliland's expert testimony concerning the cause of death, based on an autopsy report prepared by another medical doctor, violated his right to confrontation as guaranteed by the Sixth Amendment. The record is insufficient for this Court to determine whether admitting Dr. Gilliland's testimony was error under North Carolina v. Locklear, 363 N.C. 438, 681 S.E.2d 293 (2009), and more recently, under North Carolina v. Mobley, ---N.C.App. ----, ----, 684 S.E.2d 508, 510 (2009). However, even assuming without deciding that the admission of the testimony was error, we conclude that the error was harmless and does not prejudice defendant.

1. Standard of Review
Defendant did not object to Dr. Gilliland's testimony at trial on any ground. As a general rule, constitutional questions not raised at trial are deemed waived on appeal. State v. Mobley, ___N.C.App. ___, ___, 684 S.E.2d 508, 510 (2009). However, since defendant has argued plain error in the alternative in this case, we apply this standard of review. See id.; State v. Gregory, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (plain error review available as to the "admissibility of evidence").

Plain error requires a defendant to demonstrate either "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." North Carolina v. Bishop, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997). A conviction may be overturned under the plain error rule where, after a review of the whole record, it is apparent that either: (1) "the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done"; (2) "[the error] is grave error which amounts to a denial of a fundamental right of the accused"; (3) "the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial"; (4) "the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings"; or (5) "it can be fairly said the instructional mistake had a probable impact on the jury's

13

finding that the defendant was guilty." United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir. 1982) (quotation marks omitted) (approved in State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)).

2. State v. Locklear
In Melendez-Diaz v. Massachusetts, ___ U.S. ___, 129 S. Ct. 2527 (2009), the United States Supreme Court extended the holding of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), and held that several forensic analyses offered by the prosecution were inadmissible testimonial statements absent the defendant being given a prior opportunity to cross-examine the unavailable declarants. Melendez-Diaz, ___ U.S. at ___, 174 L.Ed.2d at 319, 321-22. FN1. The forensic analyses at issue in Melendez-Diaz were three "certificates of analysis," prepared by non-testifying analysts, showing that substances seized by the police during an arrest were cocaine. Id. at ___, 174 L.Ed.2d at 320.

In State v. Locklear, our Supreme Court enlarged Melendez-Diaz to encompass more than the admission of testimonial documents. One of the issues in Locklear was whether the Confrontation Clause, as applied in Melendez-Diaz, barred expert testimony from a forensic pathologist, where the testifying pathologist offered opinions as to the decedent's identification and cause of death based on testimonial documents created by non-testifying experts. Locklear, 363 N.C. at 451, 681 S.E.2d at 304. The Locklear Court held that the Sixth Amendment barred the admission of both: (1) the forensic analyses of the non-testifying pathologists, and (2) the testimony of the forensic pathologist based on the inadmissible forensic analyses. Id. at 452, 681 S.E.2d at 305. The defendant in Locklear made a Sixth Amendment objection to both the admission of the expert testimony and underlying forensic analyses at trial. Id. at 451, 681 S.E.2d at 304. However, even though the Locklear Court concluded that the admission of this evidence was error, it found the error "harmless beyond a reasonable doubt" because "[t]he State presented copious evidence" that the defendant committed the murders alleged. Id. at 452, 681 S.E.2d at 305.

3. Plain Error Analysis
In this case, Dr. Gilliland testified as to Bobby's cause of death, and did not perform the autopsy or prepare the forensic analysis from which he drew his expert opinion. One of the pathologists performing Bobby's autopsy, Dr. Lockmuller, was in the courtroom during Dr. Gilliland's testimony; however, the other participant in the autopsy, Dr. Pessinder, was in California at the time of trial.

This situation presents an interesting issue under Melendez-Diaz and Locklear: whether having one of the pathologists who prepared the autopsy report present in the courtroom audience is sufficient to satisfy the requirement of "availability" under the Confrontation Clause. See Melendez-Diaz, 557 U.S. at___, 174 L.Ed.2d at 323 ("The text of the [Sixth] Amendment contemplates two classes of witnesses-those against the defendant and those in his favor. The prosecution must produce the

14

former; the defendant may call the latter." (footnote omitted)); Crawford, 541 U.S. at 36, 60 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177, 198 n. 9 ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").FN2.

Here, we are unable to answer this question, because the autopsy report is not contained in the record. Without the aid of the document in issue, it is not possible for this Court to determine which pathologist conducted which portion of the autopsy. Thus, we cannot determine whether Dr. Lockmuller's presence in the courtroom was sufficient to satisfy "availability" as it applies to the Confrontation Clause of the Sixth Amendment, and accordingly we decline to address this issue in this case.

However, even assuming arguendo that the admission of Dr. Gilliland's testimony was error, defendant cannot show that its admission prejudiced his conviction thereby satisfying the requisites of plain error.

As discussed, the State offered a plethora of testimony and forensic evidence at trial showing that defendant murdered Bobby by lying in wait and with premeditation and deliberation. Thus, as in Locklear, the record provides sufficient proof that defendant committed first-degree murder, and it is evident that "the erroneously admitted evidence regarding [Bobby's] cause of death ... would not have influenced the jury's verdict." Locklear, 363 N.C. at 453, 681 S.E.2d at 305 (citing North Carolina v. Watson, 281 N.C. 221, 233, 188 S.E.2d 289, 296 (1972)).

Moreover, Dr. Gilliland testified that Bobby died from being bludgeoned in the head-the precise testimony offered by both Scott Daniel and defendant. Since the cause of Bobby's death was established by the persons responsible for his demise, defendant cannot show that the exclusion of Dr. Gilliland's testimony would have resulted in a different verdict, or that the admission of his expert opinion denied defendant a fair trial. Bishop, 346 N.C. at 385, 488 S.E.2d at 779. As a result, reversal of defendant's conviction is not warranted under a plain error standard of review. This assignment of error is overruled.

FOOTNOTES
FN1. This State's Supreme Court came to a similar conclusion 37 years before Melendez-Diaz in State v. Watson, 281 N.C. 221, 188 S.E.2d 289 (1972) (death certificate stating cause of death held to be inadmissible hearsay under the Sixth Amendment, but admission of the certificate was harmless error since "average jury would not have found the evidence less persuasive had the conclusory evidence contained in the certified copy of the death certificate been excluded").

FN2. Jurisdictions addressing this issue appear to be split on the meaning of "availability" under Crawford. Compare Starr v. State, 269 Ga. App. 466, 604 S.E.2d 297 (Ga. Ct. App.2004) (admission of taped interview of child rape victim did not

15

violate Sixth Amendment, even though child did not testify and child was in courthouse available to testify at time tape shown); with Bratton v. State, 156 S.W.3d 689 (Tex. Crim. App.2005) (admission of statements given to police by codefendants improperly admitted against defendant, even though codefendants were in courtroom at time the statements were read to jury).

King, 202 N.C. App. 585 at *9-*11.

The Court of Appeals' opinion as to the Sixth Amendment concerns arising out of Dr. Gilliland's testimony did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in Melendez-Diaz. Nor is the opinion based on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings. See Harrington, U.S. at ___, 131 S. Ct. at 784-85; see also Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1389-99 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Furthermore, as detailed in the Court of Appeals opinion, any error in allowing the testimony of Dr. Gilliland was harmless and had no "substantial and injurious effect or influence in determining the jury's verdict". Brecht, 507 U.S. at 637. The testimony of Dr. Gilliland's was that the victim, "Bobby," died from "multiple blunt and sharp force injuries." This was the same testimony offered by both Scott Daniel, petitioner's son, and petitioner. In fact, there was no dispute that it was both a bat and a knife which were used as the murder weapons, and that Bobby was beaten multiple times with the bat, as well as having been stabbed numerous times. Since the cause of Bobby's death was established by petitioner and her son, petitioner cannot show that Dr. Gilliland's testimony had a substantial and injurious effect or influence in the jury's verdict. The claim is dismissed.

Furthermore, given that the error was harmless, no ineffective assistance of counsel claim can be asserted from the failure of counsel to object to the testimony at trial. In <u>Strickland v. Washington</u>, 466 U.S. 668, 687-90 (1984), the Supreme Court held that to prove ineffective assistance of counsel a petitioner must show counsel's performance was deficient and that the deficiency prejudiced his case. No prejudice to petitioner can be asserted from the testimony in question.

<u>CERTIFICATE OF APPEALABILITY</u>

Having dismissed the petition, the court must now consider the appropriateness of the certificate of appealability. <u>See</u> Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") ("the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.") A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is DENIED.

17

Case 5:11-hc-02124-BO Document 12 Filed 09/10/12 Page 17 of 18

## CONCLUSION

Accordingly, respondent's Motion for Summary Judgment [D.E. 6 and 9] is GRANTED, and the matter is DISMISSED. The certificate of appealability is DENIED. Having so determined, all other pending motions [D.E. 9] are DISMISSED as MOOT. The Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this 9 day of September 2012.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE